# EXHIBIT A



## COMMONWEALTH OF MASSACHUSETTS

**NORFOLK, SS**                                    **SUPERIOR COURT**

| | |
|---|---|
| **ELLIOT SANDLER,** | |
| Plaintiff, | 22-220 |
| v. | Case No. |
| **PHILIP MORRIS USA, INC.; R.J. REYNOLDS TOBACCO COMPANY,** as successor in interest to **BROWN & TOBACCO COMPANY,** as successor by merger to **AMERICAN TOBACCO COMPANY; LIGGETT GROUP LLC;** and **THE STOP & SHOP SUPERMARKET COMPANY LLC,** | **JURY DEMAND** |
| Defendants. | |



## COMPLAINT AND JURY TRIAL DEMAND

This is a civil action for damages sustained by Plaintiff, Elliot Sandler, who developed bladder cancer caused by the Defendants' defective Camel, Lucky Strike, Marlboro, and Lark brand cigarettes and their negligent, misleading, and fraudulent marketing, distribution, and sale of cigarettes to Plaintiff. Camel, Lucky Strike, Marlboro, and Lark brand cigarettes were defective and unreasonably dangerous and should not have been marketed, given, or sold to Elliot Sandler at any time, but especially not when he was a child and un-addicted.

## SUMMARY OF THE ALLEGATIONS

1.      During the time Elliot Sandler smoked Marlboro filtered cigarettes, they were designed, tested, manufactured, marketed, promoted, distributed and/or sold by Philip Morris USA Inc. ("Philip Morris"). Marlboro cigarettes were defective and unreasonably dangerous and should not have been sold to Elliot Sandler at any time.

1

2.       During the time Elliot Sandler smoked Lucky Strike unfiltered cigarettes, they were designed, tested, manufactured, marketed, promoted, distributed, and/or sold by American Tobacco Company.   R.J. Reynolds Tobacco Company ("R.J. Reynolds") is the successor by merger to the American Tobacco Company.   Lucky Strike cigarettes were defective and unreasonably dangerous and should not have been sold to Elliot Sandler at any time.

3.       During the time Elliott Sandler smoked Camel cigarettes, they were designed, tested, manufactured, marketed, promoted, distributed, and/or sold by R.J. Reynolds.   Camel cigarettes were defective and unreasonably dangerous and should not have been sold to Elliot Sandler at any time.

4.       During the time Elliot Sandler smoked Lark filtered cigarettes, they were designed, tested, manufactured, marketed, promoted, distributed, and/or sold by Liggett Group LLC (f/n/a Liggett Group, Inc., f/n/a Brooke Group LTD Inc., f/k/a Liggett & Myers Tobacco) ("Liggett"). Lark cigarettes were defective and unreasonably dangerous and should not have been sold to Elliot Sandler at any time.

5.       Defendants Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities have known for decades that cigarette smoking causes a variety of potentially fatal diseases and that the nicotine contained in their cigarettes is a highly addictive drug. *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 146-307 (D.D.C. 2006).  Through the years, Philip Morris, Liggett, R.J. Reynolds, and other tobacco companies consistently engaged in a public relations campaign to deliberately mislead, confuse, and deceive the public, including Elliot Sandler, as to the dangerousness of their cigarettes and the addictive quality of the nicotine contained therein.

6.       Since the 1950s, Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities, having joined industry trade associations, including but not limited to, the Tobacco

2

Industry Research Committee ("TIRC"), publicly pledged "to aid and assist research into tobacco use and health" in an effort to appear concerned for smokers' health.  Contrary to these and other public statements, Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities have, since that time, acted to intentionally conceal and distort information about the negative health consequences of smoking cigarettes.

7.     Philip Morris, Liggett, and R.J. Reynolds and its predecessors' own internal documents show that they have known for decades that nicotine is an addictive drug and that their products are nicotine delivery devices.  Philip Morris' internal documents from the 1960s show that the company had knowledge that nicotine is a "powerful pharmacological agent."  R.J. Reynolds' internal documents from the 1960s show that the company considered itself to be in the business of "selling a nicotine effect, not fighting it."  Further records show that the companies knew that the primary motivation for smoking cigarettes was to obtain the effects of nicotine.

8.     Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities internally researched and acknowledged that addiction can be intensified through adjustment and manipulation of the amount of nicotine in cigarettes and the method of nicotine delivery.  In a 1972 Liggett internal document, Liggett discussed adjusting smoke pH levels with the "eventual goal of lowering the total amount of nicotine while increasing the effect of the nicotine."

9.     Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities used this information to manipulate the nicotine delivery of their cigarettes so as to initiate and maximize addiction in smokers, like Elliot Sandler, regardless of the significant health consequences they knew to be caused by smoking.

10.     Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities have also known for decades that most smokers, like Elliot Sandler, begin smoking before they are adults,

3

as children, teenagers or even pre-teens. Despite this long-standing reason to believe, and actual knowledge, that cigarette smoking is extremely hazardous to the health of smokers, Philip Morris, Liggett, and R.J. Reynolds employed targeted marketing techniques designed to attract children and teenagers to smoking in order to secure them as long-term customers.

11.     Indeed, as part of their marketing campaigns, Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities, through their employees and agents, handed out free cigarette samples, promotional items, and specially designed advertisements used to appeal to young adults, including children.

12.     Through these and other deceptive marketing efforts, Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities assisted in creating a generation of addicted smokers, including Elliot Sandler.

13.     Philip Morris, Liggett, and R.J. Reynolds and other cigarette makers, conspired together for decades in an effort to mislead the public of the hazards of smoking cigarettes. They engaged in a massive and misleading marketing campaign that intentionally minimized the significant health risks and addictive nature of their cigarettes while promoting or implying benefits to smoking their cigarettes. Philip Morris, Liggett, and R.J. Reynolds engaged in this conduct despite knowing that their cigarettes were highly addictive and dangerous products whose risks dramatically outweighed any potential utility.

14.     Upon information and belief, Elliot Sandler, while living in Massachusetts, primarily purchased Lark, Marlboro, Camel, and Lucky Strike brand cigarettes at various convenience stores and supermarkets in Norfolk County, Massachusetts, including The Stop & Shop Supermarket Company, LLC ("Stop & Shop"). The cigarettes that Stop & Shop sold were

4

defective and unreasonably dangerous and should not have been, at any time, sold or given to Elliot Sandler.

15.    Elliot Sandler seeks damages for the wrongful conduct alleged in this Complaint, which proximately caused his injuries.

## THE PARTIES

16.    The Plaintiff, Elliot Sandler, born on June 8, 1945, is a resident of Readfield, Maine. Elliot Sandler was born in Boston, Massachusetts, and at the age of five or six, moved to Randolph, Norfolk County, Massachusetts where he lived for the next twenty-five or twenty-six years.

17.    Defendant Philip Morris is a Virginia corporation that conducts business in the Commonwealth of Massachusetts.  Philip Morris manufactures, advertises, and sells cigarettes throughout the United States, including in the Commonwealth of Massachusetts.  During the time Elliot Sandler smoked Marlboro cigarettes while living in Massachusetts, between approximately 1960 and 1976, Philip Morris manufactured, advertised, and sold Marlboro brand cigarettes throughout the United States, including the Commonwealth of Massachusetts.

18.    Defendant R.J. Reynolds is a North Carolina corporation that conducts business in the Commonwealth of Massachusetts.  R.J. Reynolds manufactures, advertises, and sells cigarettes throughout the United States, including the Commonwealth of Massachusetts.  During the time Elliot Sandler smoked Camel cigarettes while living in Massachusetts, between approximately 1959 and 1976, R.J. Reynolds manufactured, advertised, and sold Camel brand cigarettes throughout the United States, including the Commonwealth of Massachusetts.  R.J. Reynolds is the successor in interest to the U.S. tobacco business of Brown & Williamson Tobacco Corporation (n/k/a Brown & Williamson Holdings Inc.), and the successor by merger to the American Tobacco Company.   American Tobacco Company manufactured, advertised, and sold Lucky Strike

cigarettes throughout the United States, including the Commonwealth of Massachusetts, during the time Elliot Sandler smoked Lucky Strike cigarettes, intermittently while living in Massachusetts, between approximately 1960 to 1976.

19.     Defendant Liggett is a Delaware corporation that conducts business in the Commonwealth of Massachusetts.   Liggett manufactured, advertised, and sold Lark cigarettes throughout the United States, including the Commonwealth of Massachusetts, during the time Elliot Sandler smoked Lark cigarettes while living in Massachusetts, from in or around 1970 until 1976.

20.     Defendant Stop & Shop is a Delaware Limited Liability company with its principal office at 1385 Hancock Street, Quincy, Massachusetts.

21.     At all pertinent times herein, Defendants acted through their duly authorized agents, servants, and employees who were then acting in the course and scope of their employment, and in furtherance of the business of Defendants.

22.     All Defendants conducted, and continue to conduct, business in the Commonwealth of Massachusetts; made contracts to be performed in whole or in part in the Commonwealth; and/or manufactured, tested, sold, offered for sale, supplied cigarettes, or placed defective cigarettes in the stream of commerce, or in the course of business, materially participated with others in so doing; and performed such acts as were intended to, and did, result in the sale and distribution in the Commonwealth of defective cigarettes from which the Defendants derived substantial revenue, directly or indirectly.

23.     All Defendants caused tortious injury by acts or omissions in the Commonwealth, and/or caused tortious injury in the Commonwealth by acts or omissions outside of the Commonwealth.

24.     From in or around 1960 until approximately 1976, while living in Norfolk County, Massachusetts, Elliot Sandler purchased Defendants' cigarette products from various convenience stores and other retail outlets in Norfolk County, Massachusetts. From the mid-1960s until 1988, Mr. Sandler smoked approximately one to one-and-one-half packs of cigarettes per day and became addicted to the nicotine in the cigarettes he smoked. Mr. Sandler's addiction resulted in his compulsive need to smoke cigarettes, thereby exposing him to more carcinogens and other toxic substances in the cigarettes he smoked. As a result, Mr. Sandler smoked Defendants' cigarettes in sufficient quantities, such that those cigarettes, directly caused and/or contributed substantially to the development of his bladder cancer.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over the subject matter of this action pursuant to G.L. c. 212, § 4. This Court has personal jurisdiction over the Defendants pursuant to G.L. c. 223A, §§ 2 and 3.

26.     Venue is proper in Norfolk County pursuant to G.L. c. 223, §§ 7 and 8(4) because the Defendants were doing business in, and because the tortious conduct described herein took place in, Norfolk County.

## FACTS RELEVANT TO ALL COUNTS

27.     Elliot Sandler was approximately fourteen years old when he began smoking, in or around 1959. His smoking was initially limited to Camel or Lucky Strike unfiltered cigarettes. As a young teen, Mr. Sandler received free samples, or sometimes full packs, of Camel and Lucky Strike cigarettes at parades and county fairs in Randolph, Massachusetts and other areas nearby. At around the age of fifteen Mr. Sandler began smoking Marlboro cigarettes and continued smoking them regularly. In or around 1970, Mr. Sandler started smoking Lark cigarettes, which

7

became his primary cigarette until he quit smoking in 1988.  During this time, if Mr. Sandler did not have access to Lark cigarettes he would smoke Camel, Lucky Strike, and/or Marlboro cigarettes.

28.     By the time Mr. Sandler graduated from high school in 1963, he was addicted to nicotine, smoking one pack of cigarettes per day and eventually smoking up to one and one-half packs per day.

29.     At the time Elliot Sandler began smoking cigarettes in about 1959 he was unable to and did not appreciate the health hazards and addictive nature of cigarettes.

30.     Elliot Sandler frequently purchased his cigarettes at various convenience stores and other supermarkets in Norfolk County, Massachusetts, including Stop & Shop.

31.     Although he tried to overcome his addiction to nicotine, Mr. Sandler was unable to do so, until in or around 1988.

32.     Elliot Sandler was diagnosed with bladder cancer in or around February, 2021.  His bladder cancer was caused by cigarette smoking.

33.     The treatments Elliot Sandler has endured in an effort to address his bladder cancer have been physically, emotionally, and mentally demanding on him.  He has experienced significant pain and suffering, which continues today.

### Cigarettes Are Inhalable by Design

34.     A "cigarette" is any roll of tobacco wrapped in paper.  15 U.S.C. § 1332(1)(A)(1).

35.     "Flue curing" is a curing process whereby tobacco is heated through tubes, known as flues, trapping the native sugar in the tobacco leaf, producing a very mild, and most importantly, an inhalable smoke.

36.     Prior to the 19th century, in the United States, the tobacco that was used to chew,

8

smoke in a pipe, in a cigar or cigarette was air cured, producing a very harsh alkaline smoke that could not be inhaled into the lungs. Thus, it was very rare for people to inhale smoke of any kind prior to the 20th century.

37.      In the early 20th century, "flue cured" tobacco was used by companies in the United States that manufactured and sold cigarettes, including Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities. This rendered them easily inhalable so that when used as intended, they were likely to cause, among other diseases, lung cancer of all cell types and other cancers, including bladder cancer. It was inhalation that allowed the carcinogens and other toxic substances produced by the burning tobacco, to enter deep into the lungs and ultimately the blood stream and after being filtered by the kidneys enter the urine, where the bladder would be repeatedly exposed to the carcinogens and other toxic substances, resulting in the beginning of the disease process.

38.      The use of "flue cured" tobacco by Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities in their cigarettes, including those that Elliot Sandler smoked, allowed the nicotine to be rapidly absorbed by the smoker, reaching the brain in mere seconds, thus beginning the addiction cycle.

### *Cigarettes Are Highly Addictive*

39.      There is simply no debate anymore about the addictive properties of nicotine. Nicotine facilitates the release of dopamine, an important neurotransmitter in the brain that is associated with the sensations of pleasure and reward.

40.      Nicotine addiction develops as the brain adapts to chronic exposure, creating unique pathways and structures including the increase of nicotinic cholinergic receptors in the brain. The effects of nicotine are short-lived, stimulating an impulse for continuous use to avoid the feeling of withdrawal symptoms such as irritability, cravings, depression, anxiety, cognitive

and attention deficits, sleep disturbances, and increased appetite.

41.     A hallmark of addiction is the difficulty quitting despite desires to do so.  More than 40% of adult smokers try to quit each year.  Despite desires to stop, only 4-7% of smokers succeed in quitting.  Even after a serious health event, such as a heart attack, most smokers relapse within weeks.

42.     The United States Surgeon General reported in 1988 that "[t]he pharmacological and behavioral processes that determine tobacco addiction are similar to those that determine addiction to such drugs as heroin and cocaine."

43.     At all times relevant to this Complaint, Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities knowingly made material misrepresentations and/or omissions to the public, including to Elliot Sandler, about the link between smoking and various diseases, and, in particular, misrepresented that nicotine is not addictive.

44.     In addition to the wealth of information about the addictive properties of nicotine emanating from scientific circles outside the tobacco industry, there is a substantial body of internal documents showing that Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities were aware for decades that nicotine is powerfully addictive, and that Philip Morris, Liggett, and R.J. Reynolds knew just how important nicotine is to cigarette smokers.  Philip Morris, Liggett, and R.J. Reynolds absolutely understood that the addiction to nicotine was the primary reasons why smokers, such as Elliot Sandler, continued to smoke.

45.     Rather than acknowledging what they had known for decades, namely, that the primary effect of nicotine is to provide a pharmacological effect on the smoker that leads to and sustains addiction, Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities used various misleading tactics to conceal the true role of nicotine, such as claiming falsely that nicotine

is needed in cigarettes for taste.   Addicted consumers were central to the continued sale of cigarettes.  Evidence from internal Philip Morris documents dating back to the 1950s show that it recognized the science establishing nicotine addiction was becoming overwhelming.  In 1958, the head of Philip Morris explicitly acknowledged this fact, albeit internally, in a memo stating, "the evidence . . . is building up that heavy cigarette smoking contributes to lung cancer either alone or in association with physical and physiological factors."

46.     To be sure that Philip Morris understood precisely what its macabre business model was, an internal memo from 1963 states "Nicotine is addictive.  We are, then in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms."  This memo was no aberration.  In a presentation to the Philip Morris board in 1969, it was stated "[w]e have, then, as our first premise, that the primary motivation for smoking is to obtain the pharmacological effect of nicotine."

47.     Internal documents also make clear that Philip Morris knew precisely how addictive nicotine is to humans.  "Different people smoke for different reasons.  But the primary reason is to deliver nicotine into their bodies.  Nicotine is an alkaloid derived from the tobacco plant.  It is a physiologically active, nitrogen-containing substance.   Similar organic chemicals include nicotine, quinine, cocaine, atropine and morphine."

48.     After the release of the Surgeon General's Report in 1964, the first governmental report linking smoking to poor health outcomes, the Vice President for Research and Development at Philip Morris acknowledged internally that "there was little basis for disputing the findings at this time."

49.     Philip Morris continued to do research internally in an attempt to test the validity of the science that was building against them related to addiction and the deleterious effects of

smoking on human health. Not surprisingly, the internal research tended to prove addiction and poor health outcomes associated with smoking. Fearing for the negative impact of this research on the bottom line of the company, Philip Morris CEO Joseph Cullman expressed "serious reservations" about the wisdom of his company documenting the negative effects of its own products.

50.    In 1973, Philip Morris Chairman James Bowling publicly disputed that cigarette smoking was an addiction. In an interview with 60 Minutes, Chairman Bowling trivialized the concept of addiction by referring to quitting as a simple choice that was no different than deciding whether to eat eggs for breakfast or not. In 1982, the Tobacco Institute, an industry trade group funded by Philip Morris, Liggett and R.J. Reynolds and its predecessor entities, among other companies, continued to trivialize the notion of nicotine addiction by referring to the "attachment" to cigarettes as something akin to the attachment to "tennis, jogging, candy, rock music, Coca-Cola, members of the opposite sex and hamburgers."

51.    Despite internal documents to the contrary, and a mountain of scientific evidence to the contrary, as recently as 1994, the CEO of Philip Morris, along with CEOs of the other large American tobacco companies, including Liggett and R.J. Reynolds, testified before the U.S. House of Representatives that it was their belief that "nicotine is not addictive." This was seen by many as the culmination of what United States District Judge Gladys Kessler referred to as "a decades long, elaborate, sophisticated, well-funded public relations offensive, denying and attacking the consensus that they had long ago reached internally." *United States v. Philip Morris USA, Inc.*, Amended Final Opinion, Case No. 99-2496 (GK) (D.D.C. 2006), p. 1268. However, the denial continued beyond the spectacle in front of Congress. After this testimony, Philip Morris engaged in national advertising in which it stated "Philip Morris does not believe cigarette smoking is

addictive. People can and do quit all the time." In 1996, Philip Morris issued a position statement

that "[t]hose who term smoking an addiction do so for ideological reasons, not scientific reasons."

As late as 1997, the president and CEO of Philip Morris compared addiction to cigarettes to simply

liking Gummi Bears. "If cigarettes are behaviorally addictive or habit forming, they are much

more like . . . Gummi Bears, and I eat Gummi Bears, and I don't like it when I don't eat my Gummi

Bears, but I am certainly not addicted to them."

52.     This denial, in the face of overwhelming scientific evidence to the contrary was

based on a long-standing tradition of denial. In response to the Surgeon General's report issued in

1988 addressing nicotine addiction, the tobacco industry pushed back against the findings of the

report. Judge Kessler summarized these efforts as follows:

> Defendants themselves possessed, from their own in-house and external research,
> information that led them to conclude, long before public health bodies did, that the
> primary reason people kept smoking cigarettes is to obtain the drug nicotine, which is
> addictive. Defendants intentionally withheld this data . . . when there were major public
> efforts to review and synthesize all available information.  This occurred with the
> preparation of both the 1964 and 1985 Surgeon General's Reports and numerous
> congressional investigations.  Defendants also engaged in a decades-long, elaborate,
> sophisticated, well-funded public relations offensive, denying and attacking the consensus
> conclusions that they had long ago reach internally . . . .

53.     Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities made the

above representations despite a substantial body of evidence, including evidence developed by

Philip Morris, Liggett, and R.J. Reynolds themselves, as well as other cigarette manufacturers,

indicating that nicotine is not only addictive, but also is the reason why people, including Elliot

Sandler, smoked.

54.     Rather than acknowledging what it had known for years, that the primary purpose

of nicotine is to provide a pharmacological effect on the smoker that leads to and sustains

addiction, Philip Morris, for decades, used various misleading tactics to conceal the true role of

nicotine, such as comparing the addictiveness of cigarettes to the enjoyment of eating Gummi Bears.

55.     Internally recognizing that nicotine was highly addictive, Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities purposely manipulated and controlled the tar and nicotine content and delivery methods of their tobacco products, including Camel, Lucky Strike, Marlboro, and Lark, to create and maintain smokers' addiction to cigarettes and assure continued future sales of cigarettes.

56.     In pursuit of perfecting nicotine addiction in smokers such as Mr. Sandler, Philip Morris, Liggett, R.J. Reynolds, and other tobacco companies developed techniques to manipulate and control the nicotine delivery of their cigarettes.  In fact, efforts were put into changing the content and structure of cigarettes to optimize nicotine delivery.  Philip Morris, Liggett, and R.J Reynolds and its predecessor entities began to include ammonia in cigarettes to increase the rate of nicotine delivery by altering the pH of the smoke, thereby increasing the availability of nicotine.

57.     Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities intentionally designed their cigarettes to contain and deliver nicotine in addictive amounts to smokers, including Mr. Sandler.

58.     Nicotine triggers a biochemical reaction in the body that causes the release of dopamine, which is a naturally occurring chemical within the body, causing a transient feeling of satisfaction in the user.

59.     The nicotine in the cigarettes smoked by Mr. Sandler was at a level high enough to create and maintain a physiological addiction.

60.     Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities had the technical capacity to reduce and remove nicotine from the tobacco they used in their cigarettes,

including Camel, Lucky Strike, Marlboro, and Lark since at least the 1960s, and most likely, before that time.  To be sure, in March, 1933, Liggett & Myers sought to patent a chemical method to reduce nicotine content of tobacco in their cigarettes.  However, their internal documents reveal that they soon realized that nicotine had to remain in their cigarettes because the nicotine is what gave smokers pleasure.

61.    The process of creating reconstituted tobacco, an engineered form of tobacco from which nicotine is extracted and later reinjected to achieve a precise dosage, is just one example of a method that could be used to reduce the level of nicotine and which was available to Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities at least as early as the 1950s.

62.    In fact, Philip Morris created a "de-nicotinized" cigarette that was tested internally and eventually put into commercial production, but Philip Morris did not continue to manufacture it.

63.    Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities understood that, to maintain a customer base, they needed to maintain the nicotine at addicting levels.

64.    Philip Morris did not continue to manufacture a reduced nicotine cigarette, making it exceptionally more difficult for an addicted smoker, like Mr. Sandler, to quit and try to avoid the devastating health consequences of a smoking addiction.

65.    The Surgeon General, in 2014, succinctly stated its conclusion with respect to the intentional manipulation of cigarettes by manufacturers to retain smokers: "cigarettes have been researched, designed, and manufactured to increase the likelihood that initiation will lead to dependence and difficulty achieving cessation due to contents and emissions in addition to nicotine (e.g., acetaldehyde, ammonia compounds, and menthol); design features that may increase free-base nicotine and produce larger puffs (filter tip ventilation); and other factors that reduce the

concerns for smokers and increase the attractiveness of the products."

66.     Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities' decades-long misrepresentations, concealment of and/or failure to disclose the true facts about smoking, disease, and addiction had devastating consequences for Elliot Sandler.  Mr. Sandler and the public were denied the ability to make an informed decision about smoking Camel, Lucky Strike, Marlboro, and Lark brand cigarettes because Philip Morris, Liggett, R.J. Reynolds, and other cigarette manufacturers deliberately misrepresented and concealed the addictive nature of cigarettes and the health consequences associated with smoking.

67.     False public statements from Philip Morris, Liggett, R.J. Reynolds and its predecessor entities, and their trade associations were made with the intent to induce consumers, including Elliot Sandler, to rely on such statements in making decisions about whether to start, or to continue, smoking cigarettes.  Brennan Dawson, Vice President of Public Relations for the Tobacco Institute, a trade association formed by and for the major tobacco manufacturers in 1958 for the purpose of providing misleading information concerning the dangers of cigarette use to the media and others, stated that she, on behalf of the Tobacco Institute, intended the public to rely on the public statements she made on television, regardless of whether the statements she made were in response to questions posed by the media or were spontaneous statements she volunteered to the media.  Walker Merryman, another long-time Tobacco Institute spokesperson, similarly stated that the Tobacco Institute intended the public to believe and rely on its public statements.

68.     In 1972, to mislead the public to believe his company's products were not harmful, Philip Morris Vice President James Bowling stated: "If our product is harmful, we'll stop making it."  Mr. Bowling made a similar misrepresentation in 1976 when he stated in an interview, "from our standpoint, if anyone ever identified any ingredient in tobacco smoke as being hazardous to

human health or being something that shouldn't be there, we would eliminate it. But no one ever has."

69.     Willful and knowing misrepresentations by Philip Morris persisted into 1997 when Philip Morris CEO Geoffrey Bible stated that he would shut down his company's plants "instantly" if cigarettes were found to be harmful to health. Mr. Bible also stated "I don't know if anyone dies from smoking tobacco. I just don't know."

70.     Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities continued their policy of misrepresentation and concealment long after they became internally aware of health consequences of smoking. It was not until 2000 that Philip Morris stated on its corporate website that it agrees with overwhelming medical and scientific consensus that cigarette smoking causes lung cancer, heart disease, emphysema, and other serious disease in smokers.

### *Cigarettes Cause Disease*

71.     Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities knew and/or should have known for decades that cigarettes cause human diseases, including bladder cancer, and other cancers and diseases, and contain carcinogenic additives that intensify the dangers of smoking.

72.     Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities, directly and through their trade associations, concealed and/or failed to disclose to the public and to Mr. Sandler the true facts about the health hazards of smoking Camel, Lucky Strike, Marlboro, and Lark cigarettes, including their highly addictive qualities.

73.     By at least the 1940s, Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities, were following the scientific studies by reputable scientists regarding the link between smoking and cancer, including Angel Ruffo, who, in the 1930s, painted tar condensed from

cigarette smoke on the backs of rabbits and the rabbits subsequently developed cancerous tumors.

74.    In 1964, Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities, were intimately familiar with the Surgeon General Report, that concluded, among other things, that smoking cigarettes was a cause of lung cancer in men and was associated with the development of bladder cancer.

75.    Between 1940 and 1950, at least four studies had linked smoking cigarettes with lung cancer.  Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities were aware or should have been aware of these studies.  This was well before Mr. Sandler began smoking cigarettes.

76.    In 1961, Philip Morris acknowledged that "carcinogens are found in practically every class of compounds in smoke."

77.    Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities, directly, and through their trade associations, the Tobacco Institute and the Center for Tobacco Research, manipulated Elliot Sandler and the public through a campaign of disinformation calculated to mislead the public about the health risks of smoking and to create doubt in the minds of smokers about the link between smoking and human disease.

78.    Notwithstanding Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities' knowledge that smoking increased the risk factors of lung diseases as well as cardiovascular disease, bladder cancer, and other diseases, Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities' written and verbal statements denied this reality and, instead, promoted the false idea that there was a legitimate scientific inquiry regarding the types of injuries caused by smoking.

79.    Indeed, in 2006, Federal District Judge Kessler found in *United States v. Philip*

*Morris USA, Inc.*, that Philip Morris had waited until 2000 to clearly state on its corporate website that it agrees with "overwhelming medical and scientific consensus that cigarette smoking causes lung cancer, heart disease, emphysema, and other serious diseases in smokers." 449 F. Supp. 2d at 208.

### Concealment of a Serious Public Health Risk

80.     In 1954, several cigarette manufacturers, including Philip Morris and R.J. Reynolds and its predecessor entities, jointly ran an advertisement in newspapers around the country entitled "A Frank Statement to Cigarette Smokers" ("Frank Statement").

81.     This 1954 Frank Statement was the response of the tobacco companies to growing scientific and medical research showing the health risks and hazards of smoking.

82.     By this advertisement, Philip Morris, R.J. Reynolds and its predecessor entities, and others, pledged to the public their financial aid to establish the Tobacco Industry Research Committee ("TIRC") to research "all phases of tobacco use and health."

83.     The "Frank Statement" was signed by most major tobacco manufacturers, including Philip Morris and R.J. Reynolds and its predecessor entities, and was a full-page ad published in major newspapers in U.S. cities with populations over 25,000, including Boston, Massachusetts. While Liggett was not a signatory to the Frank Statement, they put out an equivalent statement of their own on February 1, 1954.

84.     This Frank Statement was designed to maintain or increase sales of cigarettes as part of a plan by cigarette manufacturers, including the manufacturing defendants, to rebut growing awareness of cigarette dangers through a public relations campaign that was "entirely pro tobacco."

85.     With the Frank Statement, Philip Morris, R.J. Reynolds and its predecessor entities,

and other cigarette manufacturers claimed that "there is no proof that cigarette smoking is one of the causes [of cancer]."

86.     These manufacturers, including Philip Morris and R.J. Reynolds and its predecessor entities, pledged to smokers that they "accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business.   We believe the products we make are not injurious to health.   We always have and always will cooperate closely with those whose task is to safeguard the public health."

87.     By this Frank Statement, Philip Morris and R.J. Reynolds and its predecessor entities, represented that the research of TIRC would be led by "a scientist of unimpeachable integrity and national repute.   In addition, there was to be an Advisory Board of scientists disinterested in the cigarette industry.  A group of distinguished men from medicine, science and education were to be invited to serve on this Board.  These scientists would advise the Committee on its research activities."

88.     This statement was publicly re-affirmed multiple times by Philip Morris, R.J. Reynolds and its predecessor entities, and other cigarette manufacturers, including in 1958 and 1977.

89.     The cigarette manufacturers' goal in issuing this Frank Statement to cigarette smokers was to reassure and convince the public that there was a legitimate controversy about whether there was any proof that cigarette smoking caused cancer and/or health issues and that Philip Morris and R.J. Reynolds and its predecessor entities had "an interest in people's health as a basic responsibility, paramount to every other consideration in our business."  Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities, directly and through their industry trade associations, concealed and/or failed to disclose to the public, including to Elliot Sandler, the true

facts about the health hazards of smoking, *inter alia*, Camel, Lucky Strike, Marlboro, and Lark brand cigarettes, including their highly addictive qualities.

90.     Beginning in 1958 and continuing over decades, the Tobacco Institute ("TI"), the public relations entity funded by Philip Morris, Liggett, R.J. Reynolds and its predecessor entities, and other cigarette manufacturers, helped orchestrate for their members the strategy of "creating doubt about the health issue[s] [of smoking cigarettes] without actually denying it."

91.     Specifically, Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities knowingly and intentionally supported this strategy, suggesting that "the case is not proved," all the while knowing of, and failing to reveal, substantive, credible scientific research to the contrary.

92.     The Counsel for Tobacco Research, ("CTR") formed in 1964 by cigarette manufacturers, including Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities, described its primary mission as "support of research into questions of tobacco use and health."

93.     When CTR's funded researchers were polled, many (46%) of the responding scientists funded by CTR "believe cigarette smoking is an addiction that causes a wide range of serious, often fatal, diseases, including lung cancer."

94.     Notwithstanding that opinion by many of their own scientists, CTR and the tobacco industry, including Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities, continued to claim for decades that it was not yet proven that smoking cigarettes causes cancer and denied that smoking had been proven to cause disease.  Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities participated for decades in this sham on the public, "profess[ing] a desire to clear up the smoking and health 'question'" and "often point[ing] to its support of the CTR as evidence of its interest in investigating the health dangers of smoking."

95.     Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities, continued to

openly question the link between smoking and poor health.  In 1984, Philip Morris ran an ad openly questioning the relationship.  "Over the years you've heard so many negative reports about smoking and health, and so little to challenge these reports, that you assume the case against smoking is closed.  But this is far from the truth.  Studies which conclude that smoking causes disease have regularly ignored significant scientific evidence to the contrary . . . ."

96.     The Tobacco Industry Research Committee, the precursor of what later became known as the CTR, never publicly acknowledged that smoking was a proven cause of cancer.  An internal memo from the Council for Tobacco Research in 1972 describes a "brilliantly conceived and executed" strategy over approximately 20 years of "creating doubt about the health charge without actually denying it."

97.     In 1968, the Tobacco Institute released the "Cigarette Controversy" stating that "no scientific proof, then, has been found to convict smoking as a hazard to health."

98.     In 1971, the chairman of Philip Morris, Joseph Cullman, appeared on the TV Show Face the Nation and stated, "we do not believe that cigarettes are hazardous; we don't accept that."

99.     In 1978, Philip Morris released a publication called "Facts about the Smoking Controversy" which stated, "scientists have not determined what causes cancer . . . cigarettes have never been proven unsafe."

100.    Astonishingly, this tactic persisted into the late 1990s when Philip Morris CEO Geoffrey Bible stated that he would shut down his company's plants "instantly" if cigarettes were found to be harmful to health.

101.    Philip Morris and R.J. Reynolds and its predecessor entities' campaign to mislead the public began with the Frank Statement and continued through those companies' testimony to Congress in 1994 and beyond.

102.    Despite overwhelming evidence to the contrary, in 1994, Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities' CEOs testified that it was not proven whether smoking cigarettes caused cancer and whether nicotine is addictive.

103.    Philip Morris and R.J. Reynolds and its predecessor entities' campaign of deceiving the public, including Elliot Sandler, as to the health effects of smoking began with the issuance of the Frank Statement in 1954.  Liggett joined their campaign of deception in 1958.  This campaign of deceit and deception continued for decades, even after the 1979 Amendment to Mass. G.L. c. 93A.

104.    One purpose of the Frank Statement was to establish a Scientific Advisory Board "devoted only to the development of scientific knowledge, let[ting] the chips fall where they may" according to a March 1,1956 editorial in the New England Journal of Medicine.  As was noted, "[t]he proper role is not that of concealment, if the suspicions now directed down Tobacco Road are substantial, but that of openly and honestly acknowledging the existence of a toxic factor and trying to eliminate it."

105.    However, not only did they deny the existence of a toxic factor, Philip Morris, Liggett, as well as R.J. Reynolds and its predecessor entities, concealed for decades knowledge of the toxicity of Camel, Lucky Strike, Marlboro, and Lark cigarettes.

106.    By the late 1950s, it was accepted among the mainstream scientific community that smoking cigarettes was a cause of lung cancer and other cancers.  Despite that acceptance by the scientific community, Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities engaged for decades in a campaign to deceive the public about the health hazards of smoking, breaching its promise in the Frank Statement.

107.    Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities' decades-long

concealment of and/or failure to disclose the true facts about smoking, disease, and addiction had devastating consequences for Mr. Sandler.  Mr. Sander, and many other members of the public, were denied the ability to make an informed decision about smoking cigarettes because information concerning the addictiveness of cigarettes, as well as the associated health consequences of smoking them, were being actively manipulated and concealed by Philip Morris, Liggett, R.J. Reynolds, and others.

108.    Philip Morris, Liggett, R.J. Reynolds and its predecessor entities, other cigarette makers, and their trade associations made public statements with the expectation that consumers, including Elliot Sandler, would rely on such statements in making decisions about whether to start, or to continue, smoking cigarettes.

### *Targeted Marketing to Children*

109.    Beginning in or around the mid-1950s and continuing for many years thereafter, Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities conducted an aggressive and pervasive advertising campaign featuring radio, television, print, and billboard advertisements targeting school-age children and teenagers, in addition to other members of the public, including in Boston and the surrounding areas.

110.    In the early 1950s through at least the early 1980s, throughout Massachusetts and elsewhere around the country, R.J. Reynolds heavily promoted Camel unfiltered cigarettes through various media outlets, including radio, local newspapers, magazines, television (until late 1970), and billboards, using catchy jingles and misleading euphemisms to conceal the hazards of smoking, such as, "more doctors smoke Camels…," "not one single case of throat irritation…," "rich tasting," and "mild."  Additionally, in the early 1950s and into the 1960s, during the Christmas holidays, R.J. Reynolds and other cigarette companies, through the various media

outlets, implored people to give friends and relatives cartons of Camels, and other cigarette brands, adorned with Christmas-themed motifs.

111.    In the 1950s, throughout the United States, including Massachusetts, American Tobacco Company heavily promoted Lucky Strike unfiltered cigarettes through various media outlets, including radio, local newspapers, magazines, television, and billboards, using catchy jingles and misleading euphemisms to conceal the hazards of smoking, such as, "Be happy – Go Lucky," "It's toasted," "cleaner, fresher, smoother," and L.S./M.F.T (Lucky Strike means fine tobacco).  Throughout the 1950s, "The Hit Parade," a popular television show, was sponsored by Lucky Strike cigarettes, and the product was heavily advertised during the show.

112.    In the 1950s and 1960s, throughout the United States, including Massachusetts, Philip Morris heavily promoted Marlboro filtered cigarettes through various media outlets, including radio, local newspapers, magazines, television, and billboards, using catchy jingles and misleading euphemisms to conceal the hazards of smoking, such as, "Come to where the flavor is, come to Marlboro County," "You've got a lot to like with a Marlboro …," and "Filtered cigarette with the unfiltered taste."

113.    In the 1960s and 1970s, throughout the United States, including Massachusetts, Liggett heavily promoted Lark filtered cigarettes through various media outlets, including radio, local newspapers, magazines, television (until late 1970), and billboards, using catchy jingles and misleading euphemisms to conceal the hazards of smoking, such as "Richly rewarding, yet uncommonly smooth," "Charcoal filter with charcoal granules to purify the air," and in the ubiquitous television commercials with a narrator exhorting people on the street to "show us your Lark packs," while the words "have a Lark, have a Lark, have a Lark today," were sung to the William Tell Overture.

114.    In 1953, Philip Morris' marketing was considered successful because of its strength in the 15-24 age group.  These types of assessments continued through the 1950s (and beyond).  A marketing research report entitled "Young Smokers: Prevalence, Trends, Implications, and Related Demographic Trends" stated that "today's teenager is tomorrow's potential regular customer" and that it was "during the teenage years that the initial brand choice is made."

115.    Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities engaged in an aggressive and pervasive advertising campaign featuring radio, television, print, and billboard advertisements that created an image of smoking described by the Federal Trade Commission in 1967 as "harmless and satisfying."  These advertisements were consumed by young children, such as Elliot Sandler.

116.    Mr. Sandler saw the various cigarette advertisements in the 1950s and 1960s, while watching television, and specifically recalls the above-referenced jingles and euphemisms for Camel, Lucky Strike, Marlboro, and Lark cigarettes.  Additionally, Mr. Sandler recalls seeing the various Lucky Strike advertisements referenced above, while watching "The Hit Parade" and in Life Magazine during the 1950s and 1960s.

117.    Missing from these various advertisements was the fact that cigarettes caused lung cancer and other diseases and that nicotine in cigarettes was addictive.

118.    It was the ubiquitous cigarette advertisements that Mr. Sandler saw and heard and relied on to his detriment that informed his confusion and ultimate belief that smoking cigarettes was "cool," "pleasurable," and "fun," with no reason to believe that cigarettes were hazardous and addictive.  Unfortunately, and to his detriment, Mr. Sandler chose to trust the cigarette companies, including R.J. Reynolds, Philip Morris, and Liggett, who manufactured and sold the cigarette products he smoked, to be truthful about the health hazards of their products, namely, that they

caused lung cancer, bladder cancer, and other diseases.

119.    The cigarette makes, including Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities, who paid for their cigarette advertisements to air on television and other mediums, are the best source of information as to exactly when the various cigarette advertisements appeared on television and in other mediums.

120.    Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities targeted children under the age of 18, as sought-after marketing targets of their cigarettes, for decades. This strategy was successful. Approximately 87% of smokers first used cigarettes by the age of 18. In an R.J. Reynolds 1974 internal document, it referenced its "young adult franchise" in 1960 as the 14-24 age group.

121.    There is substantial scientific evidence that the younger a person starts to smoke, the more likely that person will develop a strong addiction to nicotine. For example, the 2010 and 2012 U.S. Surgeon General Reports concluded that the earlier someone starts to smoke, the greater the likelihood of heavy addiction to smoking as an adult.

122.    As a result of Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities' campaign of disinformation and misleading cigarette advertisements that concealed the truth about known cigarette hazards, Mr. Sandler became addicted to smoking as a child and became an habitual smoker. Mr. Sandler regularly smoked between one pack and one-and-one-half packs of cigarettes per day and was able only to quit in 1988 after decades of smoking and after numerous attempts to beat his addiction to nicotine and smoking.

123.    Elliot Sandler was diagnosed with bladder cancer on or about February 8, 2021, as a result of having smoked unreasonably dangerous cigarettes for decades.

124.    If the cigarette makers, including Philip Morris, Liggett, and R.J. Reynolds and its

predecessor entities, had disclosed the truth about the health hazards and addictiveness of their cigarette brands, including Camel, Lucky Strike, Marlboro, and Lark, at the time Mr. Sandler began smoking, he, more likely than not, would not have started smoking cigarettes, and avoided his bladder cancer.

**COUNT I**
**BREACH OF WARRANTY**
**(Against Philip Morris USA Inc.,**
**Liggett Group LLC, and R.J. Reynolds Tobacco Company)**

125.   Plaintiff adopts and incorporates all of the above allegations.

126.   Defendants have been engaged for many years in the business of manufacturing, testing, designing, advertising, marketing, packaging, selling, and/or distributing, and placing into the stream of commerce in and into Massachusetts, cigarettes, including Camel, Lucky Strike, Marlboro, and Lark cigarettes.

127.   The cigarettes manufactured and sold by Defendants were expected to and did in fact reach Elliot Sandler in substantially the same condition they were in when originally manufactured, distributed, and sold by Defendants.

128.   Defendants, as the manufacturers, sellers, marketers, and/or distributors of Camel, Lucky Strike, Marlboro, and Lark cigarettes, impliedly warranted that such cigarettes were merchantable and fit for the ordinary purposes for which they were intended.

129.   Plaintiff's use of Camel, Lucky Strike, Marlboro, and Lark cigarettes was entirely foreseeable to Defendants and was in fact intended.

130.   Philip Morris, Liggett, and R.J. Reynolds expected and intended people, like Plaintiff, to use their products all the while knowing their product was defective, unreasonably dangerous, and would cause serious harm.

131.   Philip Morris, Liggett, and R.J. Reynolds breached this warranty because the

28

cigarettes manufactured, sold, and distributed by Defendants to Elliot Sandler, and other members of the public, were defective and unreasonably dangerous to users and consumers, because such cigarettes were carcinogenic, addictive, and contained dangerous levels of tar, nicotine, and other dangerous substances.

132.    The foreseeable risks posed by Philip Morris, Liggett, and R.J. Reynolds' cigarettes could ha0ve been reduced or eliminated by their adoption of a safer, reasonable alternative design.

133.    Philip Morris, Liggett, and R.J. Reynolds are each held to the level of knowledge of an expert in the field, and further, Philip Morris, Liggett, and R.J. Reynolds had knowledge of the dangerous risks and side effects of the tobacco product of which they failed to design and protect against.

134.    Plaintiff did not have the same knowledge as Philip Morris, Liggett, and R.J. Reynolds.

135.    By selling a product that was unreasonably dangerous with no utility, the product was not fit for the purposes for which such product is used, and such danger was not known to the user at any time, including Plaintiff and particularly when Plaintiff started smoking and became addicted.

136.    Philip Morris, Liggett, and R.J. Reynolds deliberately concealed and/or intentionally withheld knowledge of the dangerousness and addictive nature of their cigarettes, including those that Plaintiff smoked.  Philip Morris, Liggett, and R.J. Reynolds also deliberately engineered their product to be unreasonably dangerous despite knowing of a safer alternative product.

137.    Although Philip Morris, Liggett, and R.J. Reynolds knew of the defective nature of Camel, Lucky Strike, Marlboro, and Lark cigarettes, they continued to promote and sell these

cigarettes without providing a safer alternative or adequate warnings and instructions concerning their use. These deliberate actions were taken to maximize sales and profits at the expense of the public health and safety of consumers, including Plaintiff.

138.    As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Plaintiff sustained injuries including, but not limited to, lung cancer, pain and suffering, mental anguish, loss of capacity for the enjoyment of life, and expenses for past medical treatment and for future medical treatment to be incurred.

139.    At all times relevant to this Complaint, Elliot Sandler used and consumed the cigarettes manufactured, sold, and distributed by Defendants in the manner in which Defendants intended and expected such cigarettes to be used.

140.    As a proximate result of Defendants' breach of warranty, Elliot Sandler contracted bladder cancer and is therefore entitled to recover the damages sought in this Complaint.

## COUNT II
### NEGLIGENCE
### (Against Philip Morris USA Inc.,
### Liggett Group LLC, and R.J. Reynolds Tobacco Company)

141.    Plaintiff adopts and incorporates all of the above allegations.

142.    Defendants owed Elliot Sandler a duty to exercise reasonable care in the design, development, testing, marketing, promotion, packaging, sale, and/or distribution of Camel, Lucky Strike, Marlboro, and Lark cigarettes.

143.    Defendants owed Elliot Sandler, and other foreseeable users, a duty to disclose to users of their cigarettes the ever-growing knowledge that smoking cigarettes is quickly addictive and causes lung cancer and other serious human diseases.

144.    Defendants breached their duty to exercise reasonable care in numerous respects, including but not limited to the following breaches:

30

a. Defendants failed to exercise reasonable care in the design, development, testing, marketing, promotion, packaging, sale and/or distribution of Camel, Lucky Strike, Marlboro, and Lark cigarettes;

b. Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities, failed to exercise reasonable care in manufacturing Camel, Lucky Strike, Marlboro, and Lark cigarettes and knew, or should have known, that when used as intended these cigarettes would result in addiction and cause human disease;

c. Philip Morris, Liggett, and R.J. Reynolds and its predecessor entities, failed to timely and/or ever disclose to Plaintiff, and other foreseeable users of Camel, Lucky Strike, Marlboro, and Lark cigarettes, their own scientific research and other scientific research known to them, which showed that use of cigarettes as intended is addictive and can likely lead to a variety of human diseases;

d. Philip Morris and R.J. Reynolds and its predecessor entities, failed to exercise reasonable care in marketing Camel, Lucky Strike, and Marlboro cigarettes, including employing marketing tactics that intentionally and/or negligently induced minors, including Elliot Sandler, to smoke Camel, Lucky Strike, and Marlboro cigarettes; and

e. Philip Morris and R.J. Reynolds and its predecessor entities, failed to exercise reasonable care in the distribution of their cigarette products, including those that Plaintiff smoked, employing tactics that intentionally and/or negligently induced minors, including Elliot Sandler to smoke Camel, Lucky Strike, and Marlboro cigarettes.

145.    As a proximate result of Defendants' negligence, Elliot Sandler developed bladder cancer and Plaintiff is entitled to recover the damages sought in this Complaint.

**COUNT III**
**CIVIL CONSPIRACY**
**(Against Philip Morris USA Inc.,**
**Liggett Group LLC, and R.J. Reynolds Tobacco Company)**

146.    Plaintiff adopts and incorporates all of the above allegations.

147.    Philip Morris, Liggett, and R.J. Reynolds actively and intentionally conspired with other tobacco manufacturers, and other members of the tobacco industry trade associations mentioned herein, to suppress information about the link between smoking and addiction, smoking and lung disease, and other diseases and distort information made available to the public to obscure the truth about the dangers of smoking. Philip Morris, Liggett, R.J. Reynolds, and others, through

their trade associations, manifested a common plan or design to commit tortious acts of concealment, suppression, or omission of information regarding the health consequences of cigarettes and their addictiveness. Philip Morris, Liggett, R.J. Reynolds, and other manufacturers knew of this plan and its purpose and each took affirmative steps to encourage the achievement of the goals of concealment and obfuscation with full intent that their consumers, including Elliot Sandler, would rely on the lack of information, or distorted and incomplete information, and become addicted to smoking.

148.    Each coconspirator knew, or in the exercise of reasonable care should have known, about the conduct of the others and about the common tortious scheme, to commit fraud upon the public, including Mr. Sandler.

149.    The Defendants engaged in the dissemination of fraudulent statements and fraudulent withholding of vital information designed to get minors to smoke and continue to smoke once addicted.

150.    Philip Morris, Liggett, R.J. Reynolds, and other cigarette manufacturers, and through their trade associations, engaged in a myriad of overt acts in furtherance of the conspiracy. Such acts included, but are not limited to:

   a.  A meeting between Philip Morris, R.J. Reynolds, and their coconspirators in 1953 to form the Tobacco Institute Research Committee, eventually renamed the Council for Tobacco Research ("CTR"), an organization which claimed its purpose was to promote research on cigarette dangers, but which instead was used by Philip Morris, Liggett, R.J. Reynolds, and other coconspirators to suppress correct information and disseminate misleading information about the dangers of smoking;

   b.  Meetings over the years of TIRC and its successor organization CTR, where the coconspirators discussed and acted upon their above stated goals;

   c.  TIRC funded research studies which avoided the issue of cancer and addiction, and instead focused on other matters, while giving the impression to the public that the "cancer question" was under "investigation;"

   d.  Subsequent creation of the Tobacco Institute in 1958, an organization formed for the purpose of providing misleading information concerning the dangers of cigarette use

to the media and others, of which Philip Morris, Liggett, R.J. Reynolds, and their coconspirators were members;

e.  The suppression of and refusal to publish various research studies carried out by coconspirators which revealed smoking to be both harmful and addictive;

f.  Meetings over the years of the Tobacco Institute, wherein Philip Morris, Liggett, R.J. Reynolds, and their coconspirators discussed and acted upon their previously stated goals;

g.  Publications, news releases, telephone calls, contacts with the press, the media, the government, and others, by the Tobacco Institute and other coconspirators, consisting of suggestions to the media to present the "other side" of the "health controversy" about cigarettes, and to quote tobacco industry sources when reporting on scientific developments showing the dangers of cigarette smoking.  These suggestions were accompanied by references to the amount of advertising carried in the magazine or newspaper and threats that such advertising would be dropped if the magazine did not comply;

h.  Numerous public statements from 1950-1962 by Philip Morris, Liggett, R.J. Reynolds, and their coconspirators that falsely criticized scientific publications and reports which showed that lung cancer and other diseases were caused by cigarette smoking;

i.  A 1953 publication by TIRC, consisting of 18 pages, containing false statements about the connection between smoking and lung cancer;

j.  Publication in 1954 by Philip Morris, R.J. Reynolds, and their conspirators, through TIRC, of "A Frank Statement to Cigarette Smokers" (Frank Statement).  The Frank Statement promised the public that Philip Morris, R.J. Reynolds, and their coconspirators would do research to reveal the true dangers of cigarette smoking.  In fact, Philip Morris, R.J. Reynolds, and their coconspirators already knew, at the time the Frank Statement was published, the true dangers of smoking cigarettes;

k.  Statements and publications by Clarence Cook Little, spokesman for TIRC, to the effect that scientific evidence showing the dangers of cigarette smoking were "not proven" or were "merely statistical."  These statements included, but were not limited to, statements made in Atlantic magazine in 1957, which were made with an intent to deceive the public into believing cigarette smoking was safe;

l.  False statements to Congress and the press, in the period 1962-1966, 1969, 1984 and 1994 minimizing the dangers of cigarette smoking;

m.  A statement by R.J. Reynolds in 1964, before a congressional subcommittee, that "[m]any distinguished scientists are of the opinion that it has not been established that smoking causes disease," and claiming a "lack of clinical and laboratory scientific evidence of the relationship between smoking and health;"

n.  Publication of an article in 1968, paid for by coconspirators, entitled "To Smoke or Not to Smoke—That Is Still the Question," in TRUE magazine which was designed to appear as a legitimate article by a genuine author.  The article was in fact written by a sportswriter who was also employed by Hill and Knowlton, the public relations firm behind the creation of TIRC.  This article deliberately misstated the known dangers of

smoking;

o. A statement by R.J. Reynolds in 1982 that "science to date after much research including over $100 million funded by our industry, indicates that no causal link [between smoking and human disease] has been shown," and that "there is absolutely no proof that cigarettes are addictive;"

p. A 1984 national advertising campaign by R.J. Reynolds, which asserted that "studies which conclude that smoking causes disease have regularly ignored significant evidence to the contrary;"

q. A 1985 publication entitled "Of Cigarettes and Science" authored by R.J. Reynolds, falsely stating that cigarettes do not cause heart disease, which publication was the subject of an FTC charge of false advertising;

r. "Research Reports on Tobacco and Health" generated on behalf of the coconspirators by the Tobacco Institute, Inc. and published for many years, which disputed the known health consequences of smoking. These releases reported on the fringe medical theories of the cause of lung cancer, other than cigarettes, in order to assuage the public's fear regarding the deadly consequences of smoking cigarettes. These theories, as reported by the Tobacco Institute, on behalf of Philip Morris, Liggett, R.J. Reynolds, and their coconspirators include, but are not limited to, that smoking lowers fatty substances in the lungs, that lung cancer is caused by a certain personality, and that emphysema is an outcome of childhood measles;

s. Statements to Congress in 1994 by Philip Morris, Liggett, R.J. Reynolds, and their coconspirators denying the addictiveness and dangerousness of cigarettes; and

t. Manufacture of cigarettes by Philip Morris, Liggett, R.J. Reynolds, and their coconspirators, acting together or individually, with the purpose of controlling and manipulating the nicotine therein, in order to create and sustain addiction in smokers.

151.    As a result of the conspiracy and their knowing participation in it, Philip Morris, Liggett, and R.J. Reynolds are responsible for the tortious and wrongful acts of their other coconspirators.

152.    As a direct and proximate result of Philip Morris, Liggett, and R.J. Reynolds' roles in the conspiracy to deceive the public about the harmful effects of smoking cigarettes, Elliot Sandler relied to his detriment on their misleading statements in their advertisements and promotions that concealed material information about the health hazards and addictiveness of cigarettes, began smoking, became addicted, ultimately contracted bladder cancer, and experienced conscious pain and suffering, and incurred substantial medical expenses and will

34

continue to incur future medical expenses.

153.    Philip Morris, Liggett, and R.J. Reynolds, by virtue of their knowing and extensive involvement in this conspiracy, are liable for damages to Elliot Sandler under a concerted action theory of recovery where each coconspirator's deliberate conduct caused another to engage in a tortious activity, and the Plaintiff is entitled to recover the damages sought in this Complaint caused by the improper activities of this conspiracy.

**COUNT IV**
**BREACH OF WARRANTY**
**(Against Stop & Shop Supermarket Company LLC)**

154.    Plaintiff adopts and incorporates all of the above allegations.

155.    At all times relevant to this action, Stop & Shop was in the business of selling products for use or consumption, including cigarette products manufactured by Philip Morris, Liggett, and R.J. Reynolds, including those cigarettes that Plaintiff smoked.

156.    At all times relevant to his action the cigarettes that Stop & Shop placed into the stream of commerce for sale, were expected to and did reach consumers, including Plaintiff.

157.    Stop & Shop, as a distributor of cigarette products, warranted through its sale of cigarette products to the public, including those that Plaintiff smoked, that they were fit for the ordinary purpose for which they were intended, pursuant to Mass. G.L. c. 106, § 2-314.

158.    Stop & Shop breached its warranty obligations to Plaintiff and other consumers, as their cigarette products sold to consumers, including those that Plaintiff smoked, were defective and unreasonably dangerous when used in the manner that Stop & Shop reasonably could have foreseen.

159.    There were no material alterations to, or modifications of, cigarettes manufactured by Philip Morris, Liggett, and R.J. Reynolds between the time of their manufacture and the time

in which they were subsequently distributed to various retail outlets, including Defendant Stop & Shop, when they were sold through the stream of commerce, to, among others, Plaintiff, who smoked them.

160.    As a direct result of such defective condition as existed when the cigarettes were sold to Plaintiff that he smoked, he became addicted and/or sustained his addiction to, the nicotine in those cigarette products, resulting in his consumption of excessive carcinogens and subsequently, the development of his bladder cancer, in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

161.    At all times relevant to this Complaint, Elliot Sandler used and consumed the cigarettes manufactured, sold, and distributed by Defendant in the manner in which Defendant intended and expected such cigarettes to be used.

162.    Stop & Shop's breaches of its warranty obligations to Plaintiff were the proximate cause of his bladder cancer.

## COUNT V
### FAILURE TO WARN
### (Against Philip Morris USA Inc.
### and R.J. Reynolds Tobacco Company)

163.    Plaintiff adopts and incorporates all of the above allegations.

164.    Defendants engaged for many years in the business of manufacturing, testing, designing, advertising, marketing, packaging, selling, and/or distributing cigarettes, including Camel, Lucky Strike, and Marlboro, and placing them into the stream of commerce in Massachusetts.

165.    Camel, Lucky Strike, and Marlboro cigarettes were expected to, and did, reach Plaintiff in substantially the same condition they were in when originally manufactured,

36

distributed, and sold by Defendants.

166.   Defendants, as the manufacturers, sellers, marketers, and/or distributors of Camel, Lucky Strike, and Marlboro cigarettes, impliedly warranted that those cigarettes were merchantable and fit for the ordinary purposes for which they were intended.

167.   Defendants breached this warranty prior to July 1, 1969, because they failed to give users and consumers of Camel, Lucky Strike, and Marlboro cigarettes prior to July 1, 1969, including Plaintiff, an adequate warning of the health hazards and addictive properties of Camel, Lucky Strike, and Marlboro cigarettes, all of which were known, or should have been known, to Defendants.

168.   The duty and urgency of providing an adequate warning of the health hazards and addictive properties of Camel, Lucky Strike, and Marlboro cigarettes were substantially heightened by the need to correct and counteract the concealment, misrepresentation, and misleading advertising engaged by Defendants prior to and at that time.

169.   Defendants' failure to disclose through an adequate warning the true facts about addiction and the risk of disease from smoking Camel, Lucky Strike, and Marlboro cigarettes caused profound harm to Plaintiff.

170.   Had Defendants provided an adequate warning about Camel, Lucky Strike, and Marlboro cigarettes, Plaintiff would have not started smoking and/or would have quit smoking and would have avoided his harm.

171.   As a direct and proximate result of Defendants' breach of warranty, Plaintiff developed bladder cancer and is entitled to recover the damages sought in this Complaint.

**PRAYER FOR RELIEF**

WHEREFORE: Plaintiff Elliot Sandler, requests judgment against all Defendants for damages for all injuries and losses recoverable, including but not limited to:

A) Pain and suffering;

B) Medical expenses;

C) All recoverable costs of this action and all legally recoverable interest; and

D) Any other relief which the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury of all claims so triable.

Respectfully submitted,

ELLIOT SANDLER

By his attorneys,

Michael R. Tein (BBO# 563029)
tein@teinmalone.com
TEIN MALONE PLLC
955 Massachusetts Avenue
Cambridge, Massachusetts 02139
(617) 939-9898

Dated: March 9, 2022